163 F.3d 749
 131 Ed. Law Rep. 593
 Eve BRUNEAU, a Minor, by and through her Guardians ad Litem,
Pat SCHOFIELD and John Bruneau, Plaintiff-Appellant,
v.
SOUTH KORTRIGHT CENTRAL SCHOOL DISTRICT and South Kortright
School Board, Defendants-Appellees.
 Docket No. 97-7495.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1997.
Decided Dec. 31, 1998.
 
 Brooks R. Burdette, New York, New York (William H. Gussman, Jr., Schulte Roth & Zabel LLP, New York, New York; Merrick T. Rossein, Steel, Bellman, Ritz & Clark, New York, New York, of counsel), for Plaintiff-Appellant.
 Frank W. Miller, East Syracuse, New York (Benjamin J. Ferrara, Craig M. Atlas, Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C., East Syracuse, New York, of counsel), for Defendants-Appellees.
 Janet Axelrod, General Counsel, National Education Association of New York (Richard N. Aswad, James F. Haley, Jr., Aswad & Ingraham, Binghamton, New York, of counsel), filed a brief amicus curiae on behalf of National Education Association of New York.
 Dennis G. O'Hara, Patricia R. Hoover, O'Hara & O'Connell, Syracuse, New York, of counsel, filed a brief amicus curiae for The New York State Council of School Superintendents.
 William R. Yeomans, Acting Assistant Attorney General, Dennis J. Dimsey, Linda F. Thome, U.S. Department of Justice, Washington, D.C., of counsel, filed a brief amicus curiae for the United States.
 Nicole L. Gueron, Friedman & Kaplan LLP, New York, New York; Martha F. Davis, Yolanda S. Wu, Julie Goldscheid, NOW Legal Defense and Education Fund, New York, New York, of counsel, filed a brief amici curiae for NOW Legal Defense and Education Fund, ACLU Women's Rights Project, Connecticut Women's Education and Legal Defense Fund, Equal Rights Advocates, National Women's Law Center, Northwest Women's Law Center, Texas Civil Rights Project, Title IX Advocacy Project, and Women's Legal Defense Fund.
 Before: OAKES, CARDAMONE, and PARKER, Circuit Judges.
 Judge OAKES concurs in a separate opinion.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal concerns alleged sexual harassment in a public school. The plaintiff, Eve Bruneau, was at the time of the events recited an 11-year-old sixth grade student in a rural upstate New York school. Her complaint asserts that her male classmates created a hostile educational environment by subjecting her and other female students in her class to verbal and physical sexual harassment. The defendant School maintained a specific policy setting forth its belief that students have an absolute right to be free from sexual harassment in the school, and that such freedom is an inherent part of every student's civil rights.
 
 
 2
 Sixth grade students experience that mysterious in-between time of life where they are too old for Barbie dolls and toy soldiers, but too young for high heels and drivers' licenses. Even adults are unsure how to interpret pre-teen behavior. Plaintiff on the one hand produced an expert witness who, after conducting a national study on sexual harassment in public schools, opined that such conduct occurs as early as the sixth grade, and that sexual harassment in grades six and higher is very prevalent. On the other hand, plaintiff's male sixth grade teacher, testifying for the School, stated that he did not believe any of the conduct charged to the sixth grade boys constituted sexual harassment. Although he conceded such behavior was inappropriate, it could not be, in his opinion, sexual harassment due to the young age of the students involved.
 
 
 3
 The jury in this case had to decide not only whether the conduct alleged was sexual harassment or merely childish misbehavior, but also whether the school could be held liable for such conduct. With the jury having absolved the school of liability, plaintiff seeks redress in this Court. Although the record suggests that the actions of plaintiff's male classmates were no doubt hurtful to those female students who were the targets of such conduct, the record also reveals that the trial court committed no error sufficient for us to vacate the verdict.
 
 BACKGROUND
 A. Facts
 
 4
 Eve Bruneau began the 1993-94 school year as a student in William Parker's sixth grade class in the South Kortright Central School (School), a public school receiving federal financial assistance. She turned 12 years old in November 1993. Her complaint alleges that she was subjected to a sexually hostile educational environment and that responsible school officials failed to remedy the situation, leading to her eventual withdrawal from the School in March 1994. The jury heard the following testimony at trial.
 
 
 5
 Bruneau asserted she was the victim of continuous verbal and physical sexual harassment by her male classmates from the start of the school year until her withdrawal six months later. She claimed this harassment created an intimidating, abusive and hostile learning environment, which interfered with her education and caused her to feel depressed. According to Bruneau, the male students regularly called her and her female classmates sexually derisive names such as bitches, prostitutes, whores, lesbians and lesbos. She further alleged that she and the girls experienced bra snapping, hair pulling, spitting, shoving of paper down their blouses, punching, pushing and other physical abuse.
 
 
 6
 On one particular occasion in October, a male student called plaintiff a "dog-face bitch." Later that day Patricia Schofield, Bruneau's mother, found plaintiff in her room crying and upset by the remark. This discovery prompted Schofield to take action. She reported the incident and others to Parker, her daughter's teacher, during a regularly scheduled parent-teacher conference on November 3. The teacher expressed his concern and assured Schofield this type of behavior would not reoccur. After he failed to speak with Bruneau or the boy involved in the incident, Schofield met with Parker again and demanded he address the matter. Parker thereafter brought plaintiff and the male student together and asked the student whether he had called Bruneau a "dog-face bitch." According to Bruneau, the student responded "no," her teacher unsuccessfully tried to elicit an apology, he then dismissed the student and told her that "people are going to call you names all your life and you'll just have to deal with it." Although Parker testified that the male student initially denied making the comment, Parker said the student eventually apologized to Eve, after which the teacher extended words of comfort to Bruneau.
 
 
 7
 Meanwhile, Schofield approached Ann Cole during a class field trip. Cole, who at the time was completing a Master's Degree in Education Counseling, interned as a guidance counselor-in-training at the School under the supervision of Deborah Joyal-Reinisch, a full time counselor. Cole thereafter met with girls from Parker's class to investigate Schofield's complaints. Having learned that the sixth grade boys regularly called the girls names and subjected them to unwanted physical touching, she reported these findings to Joyal-Reinisch. Thereafter Cole contacted Parker, conveyed Schofield's concerns to him, and convened a meeting between him and the girls to address the problem--all with Joyal-Reinisch's knowledge. The meeting occurred on November 16. Going around the room, the girls, including Bruneau, took turns describing various incidents to Parker. At the meeting's conclusion, Parker vowed to remedy the situation by moving the students' desks around.
 
 
 8
 Displeased with Parker's efforts, Schofield met on November 19 with Lynda Race, the School's assistant superintendent, to inform her of the situation in the sixth grade classroom. During that meeting, she reported Bruneau's and the other girls' complaints about the boys' behavior and Parker's response. When Race relayed those complaints back to Parker, Parker confronted Schofield and told her that if in the future she had complaints about his class, she should deal directly with him.
 
 
 9
 Bruneau claims the boys' behavior continued and, in fact, worsened in early 1994. In February 1994 Patrick Clark replaced Joyal-Reinisch as the full time guidance counselor at the School and instituted a program he later described as "sexual harassment prevention" in plaintiff's sixth grade class. That program proved ineffective.
 
 
 10
 After several unsuccessful attempts in making an appointment, Schofield eventually did meet with assistant superintendent Race again on Friday, March 25, 1994 to follow up their earlier November 19, 1993 meeting. Plaintiff and her father also were present. The meeting began with Bruneau describing the events that had occurred in the classroom and their effect on her psyche. Schofield asked that her daughter be removed from Parker's class and transferred to the other sixth grade class at the School. Race advised Schofield that only the school board could move Bruneau, and after Race further stated that she had never observed Parker's class nor contacted the parents of any of the alleged offending students, the meeting ended.
 
 
 11
 That evening, Schofield visited the home of Richard Stinson, the school board vice president. She talked with Stinson in detail about the boys' behavior in Parker's classroom and the lack of remedial action. Schofield informed Stinson of her request to transfer Bruneau and the substance of Race's response. Stinson responded that Race could affect a transfer without board approval if a parent requested it.
 
 
 12
 The following Monday, March 28, Schofield and her husband took matters into their own hands. They went to the school, and she informed Parker that Bruneau would no longer be in his class, collected her daughter's books and brought them over to the other sixth grade class. Upon discovering Schofield's actions, Race not only insisted Bruneau return to Parker's class, but later called to report that the school board had rejected the transfer. Faced with this demand, Bruneau and her parents decided she would withdraw from the School and enter Stamford Central School, located in a neighboring community where Bruneau and her family actually resided.
 
 B. Prior Legal Proceedings
 
 13
 Plaintiff initially brought the instant action in the United States District Court for the Northern District of New York on July 13, 1994, seeking declaratory, injunctive and monetary relief. Chief Judge Thomas J. McAvoy appointed Schofield as Bruneau's guardian ad litem for purposes of the suit. On December 27, 1994 plaintiff filed an amended complaint, which named South Kortright Central School District (School or School District), Lynda Race, William Parker and the South Kortright School Board as defendants. Her amended complaint set forth two separate causes of action against the defendants. First, plaintiff asserted a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Title IX), against only the School District for failing to remedy the hostile environment created by peer-on-peer sexual harassment. Second, Bruneau alleged a 42 U.S.C. § 1983 claim against all the defendants. As part of her § 1983 claim, she averred that defendants denied her right to be free from a hostile educational environment as guaranteed by Title IX and her right to equal protection under the Fourteenth Amendment of the Constitution.
 
 
 14
 On June 12, 1996 defendants moved for summary judgment and the dismissal of plaintiff's amended complaint. Chief Judge McAvoy granted partial summary judgment in favor of defendants, dismissing the § 1983 claim in its entirety. See Bruneau v. South Kortright Cent. Sch. Dist., 935 F.Supp. 162, 177-79 (N.D.N.Y.1996). The district court ruled that Title IX subsumed Bruneau's § 1983 claim, finding that Congress intended to preclude a § 1983 remedy for Title IX violations. See id. at 178-79. Moreover, the district court suggested that even if plaintiff's § 1983 claim were sustained, Race and Parker would be entitled to qualified immunity because whether peer-on-peer harassment in a school setting violated Title IX was not clearly established at the time the events of the case occurred. See id. at 179.
 
 
 15
 Defendants' motion for summary judgment on plaintiff's Title IX claim was denied because various material issues of fact were present. See id. at 177. In permitting the Title IX claim to advance to trial, the district court cautioned plaintiff that to sustain her Title IX claim against the School District for peer-on-peer harassment, she would need to show the School had actual notice of the alleged harassing conduct. See id. at 174.
 
 C. Jury Trial
 
 16
 A jury trial began on November 4, 1996 before District Judge Lawrence Kahn. Despite plaintiff's request that Parker and Race be excluded from the courtroom, the district judge allowed them to remain present for the entire trial.
 
 
 17
 At the conclusion of the trial, the district court charged the jury that to demonstrate liability under Title IX, Bruneau must prove six elements
 
 
 18
 1) She was a member of a protected group.
 
 
 19
 2) She was subject to unwelcome sexual harassment in the form of conduct or comments.
 
 
 20
 3) The harassment was based on her gender.
 
 
 21
 4) The harassment unreasonably created an intimidating, hostile, abusive or offensive educational environment.
 
 
 22
 5) The School District had actual notice of the sexual harassment conduct (the notice element).
 
 
 23
 6) The School District failed to take corrective action to remedy the discriminatory conduct and hostile learning environment.
 
 
 24
 The district court earlier had rejected Bruneau's requests to charge the jury that (a) constructive (as opposed to actual) notice of peer-on-peer sexual harassment was sufficient to establish liability and (b) any corrective action to remedy the situation must have been "prompt" to avoid liability.
 
 
 25
 With respect to the notice element, the district court determined the School could be held liable only if certain employees or agents had actual knowledge of the alleged harassment. It reasoned that to impute notice to the School, a school official must have been sufficiently aware of the conduct and armed with direct authority to remedy it. Accordingly, the jury charge listed only three persons who were eligible to receive notice on behalf of the School: William Parker (sixth grade teacher), Deborah Joyal-Reinisch (full time guidance counselor) and Lynda Race (assistant school superintendent). Other persons involved at the School, such as Richard Stinson (school board vice president), Patrick Clark (successor guidance counselor) and Ann Cole (guidance counselor-in-training) were excluded from the list.
 
 
 26
 Following the jury charge, the trial court issued a general verdict form, directing the jury to find for either plaintiff or the School District. The School earlier had requested a special verdict form be used to permit the jury to address each of the six individual elements of the Title IX claim. Bruneau's counsel, however, objected and urged the use of the trial court's proposed general verdict form.
 
 
 27
 The jury returned a general verdict in favor of the School on November 21, and judgment was entered accordingly on November 25, 1996. Plaintiff moved pursuant to Fed.R.Civ.P. 59 to set aside the verdict and judgment, and grant a new trial. When that motion was denied, Bruneau appealed. We affirm.
 
 DISCUSSION
 
 28
 Bruneau appeals from both the July 1996 order dismissing her § 1983 claim, and the November 1996 unfavorable jury verdict and the resulting judgment. In this latter aspect of the appeal, she asserts the district court erred by: charging the jury that plaintiff must prove actual notice to establish Title IX liability and that only Parker, Race and Joyal-Reinisch could receive such notice on behalf of the School; refusing to charge that corrective action to remedy the hostile environment must be taken "promptly"; and refusing to sequester Parker and Race. We discuss these issues in order.
 
 I Dismissal of Bruneau's § 1983
 Cause of Action
 
 29
 Bruneau's § 1983 claim alleged that the School District, School Board, Race and Parker deprived her of her rights guaranteed by Title IX and the Equal Protection Clause of the Fourteenth Amendment. The question of the extent to which Title IX subsumes a § 1983 claim is one of first impression in this Circuit. To aid in our discussion, we divide our analysis here into two parts: the first part considers plaintiff's attempt to enforce Title IX through § 1983; the second part examines the extent to which she based her § 1983 cause of action on an independent constitutional right, i.e., the Equal Protection Clause. However, we need not address the extent to which Title IX subsumes a § 1983 claim against the individual defendants Race and Parker because in any event, they are entitled to qualified immunity as is made clear in the following paragraphs, before we enter into our two-part analysis.
 
 
 30
 The test for determining the applicability of qualified immunity is objective. "If the law at [the time of the official's actions] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In other words, the right a government official allegedly violated is clearly established when its contours are sufficiently plain so that an official might reasonably be said to know that what he is doing violates that right. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
 
 
 31
 Here, Bruneau alleges the right to be free from a sexually hostile learning environment created by peer-on-peer sexual harassment. For purposes of qualified immunity analysis, the question is whether in the fall of 1993 such right was so clearly established under Title IX and the Equal Protection Clause that the school officials had a legal duty to identify peer-on-peer sexual harassment in the school environment and remedy it. See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1451 (9th Cir.1995).
 
 
 32
 The law does not clearly impose a duty on school officials under Title IX or the Fourteenth Amendment to stop peer sexual harassment. Indeed, there are no court of appeals cases before 1998 holding school officials potentially liable for peer sexual harassment in the school environment. Even now, there is disagreement among the circuits as to whether a school district and school officials may be held liable for sexual harassment where the officials are not directly involved in the harassment. Compare Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1013 (5th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996) (no liability absent allegations that school district itself directly discriminated based on sex), and Davis v. Monroe County Bd. of Educ., 74 F.3d 1186 (11th Cir.1996) (en banc) (same), with Oona R.S. v. McCaffrey, 143 F.3d 473, 477 (9th Cir.1998) (school officials potentially liable for discriminatory actions in failing to remedy a known hostile environment), and Doe v. University of Illinois, 138 F.3d 653, 661-62 (7th Cir.1998) (plaintiffs may state hostile environment claim against school officials for student-to-student harassment).
 
 
 33
 We hold that it was not clearly established law in the fall of 1993 that a § 1983 claim could be stated against individual officials for failure to prevent peer sexual harassment among students. Thus, defendants Race and Parker are entitled to a dismissal based on the defense of qualified immunity.
 
 
 34
 A. Section 1983 Claim Alleging Violations of Title IX
 
 
 35
 We turn now to our two-part analysis. Plaintiff alleges the defendants denied her right under Title IX to be free from a hostile school environment created by peer-on-peer sexual harassment, and seeks to use § 1983 to enforce this right. It is familiar law that § 1983 does not create substantive rights, but simply provides the procedural mechanism through which a plaintiff may bring a suit for violation of a federal right. Section 1983 supplies a cause of action to a plaintiff when a person acting under color of state law deprives that plaintiff of any "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983 (1994). In Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court explained that individuals could sue under § 1983 for violations of federal statutory, as well as constitutional, law. See id. at 4, 100 S.Ct. 2502. But § 1983 is not available for violations of all federal statutes. In Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court stated that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." Id. at 20, 101 S.Ct. 2615. Applying the Sea Clammers doctrine to Title IX, we think--for two reasons--that Title IX contains a sufficiently comprehensive enforcement scheme so as to foreclose the use of § 1983 to implement its provisions.
 
 
 36
 First, Title IX establishes a complex administrative enforcement scheme to ensure compliance with its provisions. Under this plan, an injured individual may file a complaint with the Department of Education, see 34 C.F.R. § 100.7(b) (1997), which then must promptly investigate the allegations, see id. § 100.7(c). Absent a complaint, the Department is authorized to conduct its own periodic compliance reviews. See id. § 100.7(a). If the Department either deems the allegations in a complaint to have merit or discovers violations through its own review, it will inform the institution of the violation and attempt to resolve the matter informally. See id. § 100.7(d). When all else fails, the Department may effect compliance by terminating the institution's federal funding following an administrative hearing. See id. § 100.8. The original complainant has a right to petition to become an amicus curiae at a hearing held to decide whether to terminate federal financial assistance. See id. § 101.23.
 
 
 37
 Second, in addition to these administrative remedies, the Supreme Court has ruled that Title IX implicitly permits an individual to bring a private cause of action. See Cannon v. University of Chicago, 441 U.S. 677, 709, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Once in court, the Title IX plaintiff has access to a full panoply of remedies including equitable relief and compensatory damages. See Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 73-76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (finding that Congress did not limit the remedies available under Title IX, thereby permitting money damages). The availability of a private judicial remedy is further evidence of a congressional intent to supplant a § 1983 remedy. See Wright v. City of Roanoke Redevelopment and Hous. Auth., 479 U.S. 418, 427, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); Marshall v. Switzer, 10 F.3d 925, 930 (2d Cir.1993).
 
 
 38
 We recognize that some of our sister circuits consider the implied private right of action as outside the statutory enforcement scheme. See Crawford v. Davis, 109 F.3d 1281, 1284 (8th Cir.1997); Lillard v. Shelby County Bd. of Educ., 76 F.3d 716, 723 (6th Cir.1996). These circuits limit consideration of available statutory remedies under the Sea Clammers doctrine to those expressly provided for by Title IX itself. Absent an express provision for a private right of action, they hold the existence of Title IX's administrative remedies is simply a procedure for terminating federal financial assistance for institutions violating Title IX, which--as evidenced by the Cannon Court's decision to extend the option of judicial remedies by implication--does not itself provide a sufficiently comprehensive enforcement scheme to demonstrate Congress' aim to displace § 1983 suits.
 
 
 39
 We do not adopt this narrow reading of the remedies available under Title IX's statutory enforcement scheme. The ultimate question posed by the Sea Clammers doctrine is whether Congress intended to preclude § 1983 suits when it enacted the relevant federal statute. See Smith v. Robinson, 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) ("[Section] 1983 is a statutory remedy and Congress retains the authority to repeal it or replace it with an alternative remedy. The crucial consideration is what Congress intended."). Accordingly, we must look to more than just the express remedies contained within the statute to ascertain fully Congress' purpose.
 
 
 40
 In Wright, the High Court held "[u]nder [Sea Clammers ], if there is a state deprivation of a 'right' secured by a federal statute, § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." Id. at 423, 107 S.Ct. 766 (emphasis added). This "other specific evidence from the statute itself" includes a statute's legislative history. See, e.g., Smith, 468 U.S. at 1009, 104 S.Ct. 3457 (using the provisions of a statute and its legislative history to determine whether Congress intended to limit claims to those that could be brought under the statute's administrative and judicial mechanism).
 
 
 41
 Here, the Supreme Court has found that Title IX's legislative history clearly indicates Congress' plan to create a private right of action in the statute as a remedy to secure the enforcement of its provisions. See Cannon, 441 U.S. at 694, 99 S.Ct. 1946. Thus, we include this implied right of action as part of Title IX's enforcement scheme. See also Waid v. Merrill Area Public Schools, 91 F.3d 857, 862-63 (7th Cir.1996); Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 789 (3d Cir.1990).
 
 
 42
 In sum, given Title IX's administrative and judicial remedies, we believe it was Congress' scheme that a claimed violation of Title IX be pursued under Title IX and not § 1983.
 
 
 43
 B. Section 1983 Claim Alleging Violations of the Equal Protection Clause
 
 
 44
 Bruneau further alleges that even if Title IX is sufficiently comprehensive to preclude her § 1983 claim for violations of that statute, Title IX does not bar her § 1983 claim for violations of the Equal Protection Clause of the Fourteenth Amendment. She maintains this constitutional right provides an independent basis for maintaining her § 1983 claim.
 
 
 45
 Plaintiff finds support for this proposition in the Sixth, Eighth and Tenth Circuits, which have carved out an exception to the Sea Clammers doctrine for constitutional rights. These circuits allow a Title IX plaintiff to bring a separate § 1983 action predicated on a violation of a constitutional right. For example, the Eighth Circuit concluded that Sea Clammers does not prevent a Title IX plaintiff from asserting an additional cause of action under § 1983 for violations of the Equal Protection Clause, even when the same set of facts gives rise to the claimed violation of the statutory right. See Crawford v. Davis, 109 F.3d at 1284. Similarly, the Sixth Circuit declined to apply Sea Clammers to a case alleging both a Title IX claim and a § 1983 cause of action for violations of plaintiff's Fourteenth Amendment rights. See Lillard v. Shelby County Bd. of Educ., 76 F.3d at 722-24. The Sixth Circuit reasoned in part that plaintiff's § 1983 action did not purport to gain remedies unavailable under Title IX, but instead sought to enforce distinct and independent substantive due process rights. See id. at 722-23. Likewise, the Tenth Circuit adopted the analysis set forth in Lillard and ruled that Sea Clammers did not bar a plaintiff from bringing causes of action under both Title IX for violations of the statute and § 1983 for violations of constitutional rights. See Seamons v. Snow, 84 F.3d 1226, 1233-34 & n. 8 (10th Cir.1996).
 
 
 46
 We see nothing in Sea Clammers that would support a constitutional rights exception. Sea Clammers analyzes the alternative remedies available to a plaintiff to determine whether Congress aimed to replace § 1983 as an available remedy. See 453 U.S. at 13, 20, 101 S.Ct. 2615. The exception that the Sixth, Eighth and Tenth Circuits have carved out shifts the focus of Sea Clammers toward the nature of the underlying right that a plaintiff asserts. Not surprisingly, nowhere in the Supreme Court's doctrine is there a requirement that a court examine what sort of underlying cause of action is alleged in a § 1983 claim to determine whether it is foreclosed by the statute. In short, no special exemption is provided for constitutional claims.
 
 
 47
 The Supreme Court, in fact, found quite to the contrary when it applied Sea Clammers to a case involving an underlying constitutional claim. The plaintiff in Smith v. Robinson suffered from cerebral palsy and a variety of physical and emotional handicaps. 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746. When defendants terminated his educational funding, plaintiff sued, asserting, among others, a claim under the Education of the Handicapped Act, 20 U.S.C. § 1400 et seq. (EHA), and a § 1983 Equal Protection claim. See 468 U.S. at 994, 104 S.Ct. 3457. Applying the Sea Clammers doctrine, the Supreme Court determined the EHA contained a sufficiently comprehensive enforcement scheme, see id. at 1009-12, 104 S.Ct. 3457, for it to hold
 
 
 48
 Congress perceived the EHA as the most effective vehicle for protecting the constitutional right of a handicapped child to a public education. We conclude, therefore, that where the EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or on the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim.
 
 
 49
 Id. at 1013, 104 S.Ct. 3457 (emphasis added).[1]
 
 
 50
 The same reasoning governs the instant case. Plaintiff seeks to maintain her § 1983 cause of action for violations of the Equal Protection Clause. Her amended complaint states
 
 
 51
 Defendants have discriminated against plaintiff in the educational activities and programs of the South Kortright School on the basis of her sex in violation of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983. All defendants had a duty to provide and ensure an educational environment for the Plaintiff, free of sexual innuendo, intimidation and discriminatory animus, and to enforce the rules, regulations, and laws necessary to protect her and other female students from acts of sexual harassment.
 
 
 52
 First Am. Compl. p 55. Essentially, she alleges the defendants violated her Equal Protection right by failing to remedy the situation at the School. Therefore, her § 1983 claim is based on the same factual predicate as her Title IX claim. Like Smith, the question is whether the same set of facts can provide a viable cause of action for both a Title IX and a § 1983 claim. See 468 U.S. at 1009, 104 S.Ct. 3457 (acknowledging that plaintiff's Equal Protection claim was virtually identical to the statutory claim).
 
 
 53
 Although Bruneau has a constitutional right to an educational environment free of sexual harassment, we have already determined that Title IX provides the exclusive remedial avenue. Congress intended Title IX to be the appropriate vehicle to protect all of plaintiff's rights arising in this situation as Title IX's enforcement scheme fully addresses her constitutional claims against the School District and School Board. Consequently, we hold that plaintiff may not maintain her § 1983 claim and thereby bypass the comprehensive remedial scheme created in Title IX.
 
 
 54
 In so holding, we join the Third and Seventh Circuits in recognizing no constitutional rights exception to the Sea Clammers doctrine. These circuits have held that a § 1983 claim based on the Equal Protection Clause is subsumed by Title IX. See Waid v. Merrill Area Public Sch., 91 F.3d at 862; Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d at 789. We agree with this view. Having already presented her Title IX cause of action to a jury and lost, Bruneau is now relegated to challenging matters that occurred at her Title IX trial.
 
 II Appeal From the Title IX Verdict
 A. The Notice Element of the Jury Charge
 
 55
 In her brief to this Court and at oral argument, plaintiff challenges the district court's jury charge on two grounds. She first alleged it was error to instruct the jury that actual notice--as opposed to constructive notice--must be proved. Since that time, however, the Supreme Court has ruled that a high school student, who had a sexual relationship with a teacher but did not report it to school officials, could recover damages from the school district only if it had actual notice of and was deliberately indifferent to the teacher's misconduct. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 118 S.Ct. 1989, 2000, 141 L.Ed.2d 277 (1998). In light of this ruling, Bruneau's counsel advised this panel by letter dated June 26, 1998 that the Supreme Court opinion answers the question of what is the appropriate standard of notice, and therefore we must affirm the district court's holding on that issue. We agree.
 
 
 56
 Bruneau's second ground for attack is that the district court erred by limiting the class of persons eligible to receive notice on behalf of the School District to William Parker, Deborah Joyal-Reinisch and Lynda Race. Bruneau contends the general verdict for defendants must be reversed because we cannot be certain what effect, if any, this error may have had upon the jury's verdict. Of course, by having insisted on a general verdict form, plaintiff now deprives us of the opportunity to review specific jury findings relevant to issues she raises on appeal. In seeking a reversal, she consequently must rely upon the general verdict rule.
 
 1. General Verdict Rule
 
 57
 The general verdict rule was developed to determine the viability of a verdict in favor of a plaintiff when alternative theories for imposing liability are given to the jury, but one of those theories should not have been submitted. In such cases, the usual course is to reverse the verdict and order a new trial because it is impossible to determine whether the invalid theory was or was not the sole basis for the verdict. See, e.g., United N.Y. and N.J. Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959) (reversing a general verdict and ordering a new trial because one of two theories of liability submitted to the jury was invalid and there was "no way to know that the invalid [theory] was not the sole basis for the verdict"); Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir.1987) (finding that one of several theories of liability submitted to the jury was unsupported by the evidence and therefore reversing the general verdict); Morrissey v. National Maritime Union of Am., 544 F.2d 19, 26 (2d Cir.1976) ("The general rule is that when one of the two claims that have been submitted to the jury should not have been submitted, a general verdict ... cannot stand."). The rule has also applied where, as in Bruneau's case, the verdict was in favor of the defendant. See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 704 (2d Cir.1993).
 
 
 58
 The case at bar presents a somewhat unique twist to the general verdict rule. Here the trial court submitted only one theory of liability to the jury. Nonetheless, the underlying rationale of the general verdict rule applies with equal force. We are confronted with the same uncertainty problem as in those cases where multiple theories are submitted. Since Bruneau bore the burden of proof on all six elements of her Title IX claim, the School would prevail if the jury found she failed to establish any one of them. Because of the general verdict, we cannot be certain which element or elements the jury thought plaintiff failed to prove. For example, we do not know whether the jury found Bruneau failed to establish the disputed notice element of her Title IX claim and, if so, whether that was the sole reason the jury denied her relief.
 
 
 59
 Yet, the general verdict rule does not mandate reversal in all circumstances. We have specifically recognized the possibility of applying harmless error analysis where appropriate to avoid the usual course of reversal and new trial. Harmless error arises when we are sufficiently confident that the verdict was not influenced by an error in the jury charge. See Morrissey, 544 F.2d at 27. We look to see "what effect the error had or reasonably may be taken to have had upon the jury's decision." Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (emphasis added). That is to say, harmless error analysis does not require absolute certainty with respect to what effect the error had upon the verdict. See id. at 764-65, 66 S.Ct. 1239 ("If, when all is said and done, [a reviewing court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.").
 
 
 60
 In short, when we are able to conclude that the verdict was not substantially influenced by the alleged error, then we may be quite confident the objecting party's rights were not prejudiced and may uphold the general verdict. See id.; Morrissey, 544 F.2d at 27; see also Asbill v. Housing Auth. of the Choctaw Nation of Okla., 726 F.2d 1499, 1504 (10th Cir.1984) (recognizing the harmless error exception).
 
 2. Confidence in the Jury's Verdict
 
 61
 In the present case, we are convinced that even had the district court expanded the group of persons eligible to receive notice on behalf of the School, the jury would have reached the same verdict. Thus, this alleged error in the charge cannot now form the basis for reversing the general verdict in favor of the defendants. Cf. Kotteakos, 328 U.S. at 764-65, 66 S.Ct. 1239.
 
 
 62
 As an initial consideration, plaintiff proffered ample proof for the jury to have found in her favor on the notice element as it was charged, i.e., that William Parker, a person listed as eligible to receive notice on behalf of the School, in fact, received actual notice of the alleged discriminatory conduct in his classroom. Plaintiff testified Parker was present and actually saw the conduct she complained of. Parker himself confirmed he observed name calling, pushing and shoving between his students on numerous occasions. His personal observations alone are sufficient to establish his actual notice.
 
 
 63
 Further, the jury heard undisputed testimony that several persons notified Parker of the hostile conduct. Parker conceded that staff members in the School had communicated the problem to him, and that plaintiff and the other girls in the class told him at their November meeting about the boys' conduct. One girl testified that female students continued to complain to Parker after the meeting. In addition, Ann Cole stated that following the November meeting, she advised Parker that the girls did not believe the situation in the classroom had improved. Bruneau's mother, Ms. Schofield, also met with Parker to voice her concerns. Hence, we can be quite confident Bruneau's Title IX claim did not fail for a lack of actual notice to an authorized agent of the defendant School, even taking into account the shortened list of agents given by the trial court.
 
 
 64
 To the extent the jury ruled against Bruneau and in light of the School's concession that Bruneau is a member of a protected class, we believe jurors must have found Bruneau failed to prove one of the other four remaining elements of her Title IX claim. For example, the jury could have found that even if harassment had occurred, it was not based on sex due to the age of plaintiff's male peers. See Monica L. Sherer, No Longer Just Child's Play: School Liability Under Title IX For Peer Sexual Harassment, 141 U. Pa. L.Rev. 2119, 2130 (1993) ("That a student's behavior be fairly recognized as flirting or teasing rather than sexual harassment is a legitimate concern because such a mischaracterization may discourage healthy social/personal relationships."). Or, jurors might have found that defendants took appropriate corrective action to remedy the alleged conduct and hostile environment. These legitimate, alternative explanations for the verdict bolster our confidence in concluding that the refusal to expand the list of the School's agents eligible to receive notice had no influence on the outcome of the trial.
 
 
 65
 B. Refusal to Charge that Remedial Action Must Be Taken "Promptly"
 
 
 66
 Title IX prohibits sex discrimination in education programs receiving federal financial assistance. It statesNo person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....
 
 
 67
 20 U.S.C. § 1681(a) (1994). This prohibition requires an educational institution, once it has notice of the existence of a hostile educational environment created by peer-on-peer sexual harassment, to take steps to remedy the situation. Cf. Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir.1994) (explaining that under Title VII, an employer will be liable for co-worker sexual harassment if it "knew of the harassment but did nothing about it"). Accordingly, the district court charged the jury that Bruneau must prove the "defendant [School District] failed to take corrective action to remedy the discriminatory conduct and hostile learning environment." It further instructed the jury to consider what steps the School took and whether those steps were appropriate and effective. Bruneau argues that the district court erred by refusing to charge the jury that Title IX requires the School District to take "prompt" remedial action.
 
 
 68
 We review a claim of error in a jury instruction de novo and will reverse only if the error was prejudicial in light of the charge as a whole. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 153 (2d Cir.1997). A jury instruction is proper so long as the charge correctly and sufficiently covers the case to allow the jury intelligently to decide the questions presented to it. See Schermerhorn v. Local 100, Transp. Workers Union of Am., 91 F.3d 316, 322 (2d Cir.1996).
 
 
 69
 In support of her argument that the jury charge should have contained the word "prompt," Bruneau relies upon our decision in Ethan Allen where we expressly approved a jury charge instructing that an employer would be liable if "management level employees failed to implement prompt and appropriate corrective action." 115 F.3d at 153 (emphasis added). She also points to comparable case law in other circuits. See, e.g., Swentek v. USAIR, Inc., 830 F.2d 552, 558 (4th Cir.1987) (stating that an employer is liable if it "took no prompt and adequate remedial action"); Jones v. Flagship Int'l, 793 F.2d 714, 719-20 (5th Cir.1986) (including among the elements of a hostile work environment claim whether "the employer knew or should have known of the harassment in question and failed to take prompt remedial action").
 
 
 70
 That we approved the use of the word "prompt" used in one jury charge however, does not mean the word must be inserted in every jury charge. For example, in Kracunas v. Iona College, 119 F.3d 80 (2d Cir.1997)--which involved a Title IX claim by students against a college for hostile environment sexual harassment--we held a defendant must take "appropriate remedial action" in response to a complaint of sexual harassment to escape liability. Id. at 89. Implicit in our understanding of "appropriate" was the notion that the action must be prompt. See id. at 90 ("[T]he district court erred in concluding that Iona's response to the harassment--coming four to six months after [its agent] first learned of the allegations--was appropriate as a matter of law."). A remedial action taken following a lengthy and unjustified delay therefore, cannot be deemed "appropriate."
 
 
 71
 In the present case, the district court instructed the jury to consider the appropriateness of the corrective measures taken. This instruction adequately explained the law because an analysis of the appropriateness of the actions taken would necessarily incorporate the issue of timeliness. Thus, it was not reversible error for the district court to omit the word "prompt" from its instructions.
 
 C. Refusal to Sequester Race and Parker
 
 72
 Bruneau requested that Race and Parker be excluded from the trial pursuant to Fed.R.Evid. 615 so that they could not hear the testimony of other witnesses. Judge Kahn refused to grant this request and permitted the two to remain in the courtroom throughout the trial, notwithstanding the fact that they subsequently testified as witnesses for the School. The district court determined both witnesses were essential to the defendant's case and therefore exempted them from any sequestration order. Bruneau asserts this decision constitutes reversible error.
 
 
 73
 Rule 615 grants a party the right to request the exclusion of a witness from the courtroom in order to prevent the witness from hearing the testimony of other witnesses. The rule seeks to prevent the "tailoring" of a witness's testimony to that evidence given earlier in the trial and helps to uncover fabrication. See Geders v. United States, 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). A party's request to exclude a witness during trial must be granted as a matter of right, unless the witness sought to be excluded fits into one of three exempted categories. See Fed.R.Evid. 615 advisory committee's note.
 
 
 74
 One such category of witnesses are those persons "whose presence is shown by a party to be essential to the presentation of the party's cause." Fed.R.Evid. 615. Whether a witness is essential and thus exempt from an order of exclusion is a matter committed to the trial court's discretion. See United States v. Jackson, 60 F.3d 128, 134 (2d Cir.1995); United States v. Payan, 992 F.2d 1387, 1394 (5th Cir.1993). We will reverse that determination only for an abuse of discretion. See Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd., 993 F.2d 1201, 1209 (5th Cir.1993); Payan, 992 F.2d at 1394; United States v. Agnes, 753 F.2d 293, 306 (3d Cir.1985).
 
 
 75
 Six factors serve as guides to inform a district court's exercise of its discretion: (1) how critical is the sought-to-be-excluded witness's testimony; (2) whether that testimony is ordinarily subject to tailoring; (3) whether the testimony is likely to cover the same issues as other witnesses; (4) in what order will the witnesses be called; (5) whether any potential for bias exists that could incline a person to tailor his testimony; and (6) whether the witness's presence is essential or simply desirable. See Jackson, 60 F.3d at 135.
 
 
 76
 Plaintiff has not shown that the district court abused its discretion by exempting Race and Parker from a Rule 615 sequestration order. The court reasoned that Race, as the School's assistant superintendent, was the official most knowledgeable of the School's Title IX policy, and she also knew what actions the School had taken to remedy its alleged violation. The court also found that Parker, as Bruneau's sixth grade teacher, was the only legally responsible school official present in the classroom with the opportunity to observe directly the alleged discriminatory occurrences. We find no error in the conclusion that both witnesses were essential to the presentation of the School's case and therefore needed to be accessible in the courtroom throughout the trial.
 
 
 77
 Moreover, we believe Race's and Parker's testimony was not subject to tailoring. Their testimony had been previously recorded during extensive examinations before trial. Thus, any alteration at trial of the testimony given in deposition would be subject to challenge on cross-examination. The order in which the witnesses were called was not an important consideration in this case because Race and Parker were present during the pre-trial depositions of plaintiff and other of her witnesses, and therefore had already heard most of the courtroom testimony.
 
 
 78
 Hence, none of the three challenges raised concerning matters at trial constitute a reversible error warranting a new trial. As a consequence, the judgment based on the jury's verdict for the defendant must be affirmed.
 
 CONCLUSION
 
 79
 Accordingly, for the reasons stated, the order dismissing Bruneau's § 1983 claim in its entirety and the judgment following trial on the Title IX claim are affirmed. The district court dismissed Bruneau's § 1983 claim against the School District and School Board, correctly finding that Title IX subsumes Bruneau's § 1983 claim against these defendants. Because we hold that the district court properly ruled that Parker and Race were entitled to qualified immunity, we need not determine whether Title IX subsumes a § 1983 claim against individual state actors in a school setting.
 
 
 80
 Order and judgment affirmed.
 
 OAKES, Senior Circuit Judge:
 
 81
 I concur in Judge Cardamone's extensive and well-analyzed opinion in its entirety, but write separately to add a few words of explanation.
 
 
 82
 It is irrefutable that Congress could not, by enacting a statute like Title IX, somehow erode or limit a constitutional right such as the right to equal protection under the Fourteenth Amendment to the United States Constitution. A careful analysis of Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), indicates that it does not threaten that position. When Smith is analyzed closely, one recognizes that the case held, in part, that "Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim." Id. at 1012, 104 S.Ct. 3457. In other words, because § 1983 is a statutory remedy, and Congress retains authority to repeal or replace it, Title IX may have that effect. Here, as in Smith, there is no issue of "Congress' ability to preclude the federal courts from granting a remedy for a constitutional deprivation." Id. at 1012 n. 15, 104 S.Ct. 3457. This case makes not even the slightest inroad into the well-established jurisprudence to the effect that if Congress were to repeal all statutory remedies for constitutional violations, the federal courts could still grant whatever relief were necessary to remedy the wrong done in violation of the Constitution. See id. (citing Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 396, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); id. at 400-06, 91 S.Ct. 1999 (Harlan, J., concurring in judgment)).
 
 
 
 [1]
 Although Congress amended the EHA so that the statute now clearly provides that it is not the exclusive remedy, see 20 U.S.C. § 1415(f) (1994), thereby effectively overruling Smith, the analysis utilized by the Supreme Court remains relevant