**Marie O'Neill MANFREDI, as Natural Parent and Guardian Ad Litem of Frances O'Neill, an Infant Under the Age of Ten Years, Plaintiffs,**

v.

**The MOUNT VERNON BOARD OF EDUCATION, Thomas A. Pesce, Individually, and in His Capacity as Principal of the Pennington Grimes School, Cheryl Wirchen, Individually and in Her Capacity as a Teacher Employed by the Mount Vernon Board of Education. Defendants.**

No. 97 CIV. 7103(CM).

United States District Court,
S.D. New York.

April 12, 2000.

Solomon Abrahams, White Plains, NY, for plaintiff.

Vincent P. D'Andrea, Donoghue, Thomas, Auslander & Drohan, Scarsdale, NY, for defendants.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Marie O'Neill Manfredi brings this action on behalf of her minor daughter, Frances O'Neill, a student at Pennington Grimes School, an elementary school administered by Defendant Mount Vernon Board of Education. During the period relevant to this litigation, Defendant Thomas Pesce was the principal of Pennington Grimes. Defendant Cheryl Wirchen was minor Plaintiff's second-grade teacher.

Plaintiff brings a claim under Title IX, 20 U.S.C. § 1681 *et. seq.*, as well as a pendent state claim based on common law negligence, on the ground that Frances was sexually harassed by a second grade boy while she was a second grader at Pennington Grimes. Plaintiff, through her mother, contends that the school administrators demonstrated deliberate indifference to the harassment and that the harassment resulted in a denial of her right to education.[1]

Defendants together moved for summary judgment on the ground that Plaintiff has failed to raise a genuine issue of material fact as to whether her daughter was subjected to sexual harassment. In addition, the Individual Defendants argue that no action may be maintained against individuals under Title IX. The Individual

Defendants argue in the alternative that they are entitled to qualified immunity.

Because I find that no rational trier of fact could conclude anything except that what took place between two second graders at Pennington Grimes was not "sexual harassment," Defendants' motion for summary judgment is granted and all federal claims against the Defendants. are dismissed. The Court declines to exercise jurisdiction over the State law claim.

### Factual Background

The following are the facts, based on the deposition testimony of Plaintiff and her daughter and on the Plaintiff's Rule 56.1 statement of undisputed material facts.

In the school year 1995–1996, Frances O'Neill was a seven-year-old student enrolled in the second grade at Pennington Grimes School, a public elementary school located in Mount Vernon, New York. Pennington Grimes is within the jurisdiction of Defendant Mount Vernon School District.

Frances alleges that a boy in her class, Lamar M., "maintained a continuous wrongful course of conduct directed against the minor Plaintiff of hitting, pushing and tormenting, verbally abusing, harassing, spitting, and sexually abusing the infant plaintiff." (Complaint ¶ 8). Ms. Manfredi testified that the allegations were based on a series of events during the 1995–96 school year, which she testified her daughter had related to her. At some point, Ms. Manfredi prepared her own chronology of events based on her conversations with her daughter. Both she and Frances used the chronology to refresh their recollections during their deposition testimony. (Def's Aff. Exh. D at 78.) The events are summarized as follows:

---

1. Plaintiff's Complaint included claims under Title VII and Section 1983. These claims were dismissed by the Court *sua sponte* at the pretrial conference held on May 28, 1999. The Second Circuit has made clear that Section 1983 actions brought on a theory of peer-to-peer sexual harassment are precluded by the availability of relief under Title IX. *See Bruneau v. South Kortright Central School District,* 163 F.3d 749, 755 (2d Cir.1998).

1995
November: Lamar "pushed her down in the school yard." As a result, Frances "fell on her backside and scraped her elbow."

1996
January 9: Lamar teased her and threw little papers at her.
January 16: Lamar "teased" her.
January 23: Lamar punched her and spit on her hand.
February 14: Lamar "tormented" her.
March 5: Lamar "teased" her.
March 14: Lamar "bothered" her, causing her to scream at him and have the teacher send her out of the classroom.
April: Lamar pushed her friend, causing Frances to yell at him and again have the teacher send her out of the classroom.
May 21: Lamar "grabbed her calf."
May 23: Lamar "touched her private spot."
(Manfredi Dep. at 9, 14; Def's 56.1 Statement.)

Regarding the school yard pushing, Manfredi testified that her daughter told her about the incident and showed her the scrapes and bruises on her arm and backside. Frances did not tell Ms. Wirchen about the incident. Ms. Manfredi testified that the day after the incident she told Mr. Pesce about the pushing. According to Ms. Manfredi, Pesce responded, "well, you're not the first parent that complained about him, he's a troubled kid, troubled boy, and I'll look into this matter for you." (Manfredi Dep. at 12.) Manfredi testified that she never heard from Pesce again regarding the incident. (Id. at 13.)

The first "teasing" incident in January allegedly took place in the classroom in the presence of Wirchen and other students. Manfredi testified that her daughter was "distraught" and did not want to go back to school after this teasing. Frances did not suffer any physical injuries. Manfredi said that the next day she spoke with Wirchen and told her, "Look, he already pushed her on the floor, I spoke to Mr. Pearce about it. Now he's tormenting her in your classroom and I want something done about it." (Manfredi Dep. at 16.) According to Manfredi, Wirchen stated that she had already experienced problems with Lamar, and that she would undertake to do something about it. (Id. at 17.) Manfredi did not speak with Wirchen again until after the January 16 incident.

On January 16, after Manfredi accompanied Frances home from school, Frances told her mother that Lamar had been bothering her again. (Manfredi Dep. at 22.) Manfredi testified that she immediately called Pesce to complain about Lamar's continuing to tease Frances. According to Manfredi, she and Pesce spoke for about four or five minutes, and Pesce stated that he would have a talk with Ms. Wirchen about the problem. The next day after she dropped Frances at school, Manfredi spoke with Ms. Wirchen and asked her to change Frances' seat in the classroom to get her away from Lamar. (Frances was seated at the same "square" as Lamar, with one child seated between them.) Principal Pesce walked by while Manfredi and Wirchen were discussing Lamar and, according to Manfredi, Manfredi testified that Pesce reassured her that he would take care of the matter. (Id. at 25). Manfredi testified that she saw Wirchen the next day at lunch hour, and that Wirchen told her that she was going to change Frances' or Lamar's seat that afternoon.

The next incident occurred on January 23 during a school trip to the planetarium. At the planetarium, Lamar was seated behind Frances. Lamar allegedly kicked and touched Frances' seat.[2] When she turned around to tell him to stop kicking the seat, he punched her in the face. In response, Frances got very mad and got up to hit him back. Ms. Wirchen then told Frances to go sit on the floor. According to Manfredi (who was not present), Wirchen yelled at Frances without asking her what was wrong. While on the bus on the way home from the planetarium, Lamar "spit on [Frances'] hands." (Manfredi Dep. at 31.) Frances did not tell Wirchen about the spitting. Manfredi testified that she observed a small red mark on Frances' face after she got home that evening. She called Mr. Pesce, who told her that Lamar's parents were coming in for a meeting at the school about other complaints about Lama—unrelated to Frances—the

---

2. Her planetarium seat, not her derriere.

next day. Frances did not seek medical attention after the incident.

On the morning of January 24, Manfredi went to Pennington Grimes, where she saw Lamar and his parents. Manfredi testified that in the presence of Lamar, Frances, Mr. Pesce and Ms. Wirchen, she told Lamar's parents about Frances' problems with him. She told them "your son is torturing my daughter." (Manfredi Dep. at 43.) She added, "If you don't discipline him, someone else will. The next time he bothers my daughter, I will call the authorities." (*Id.* at 44.) Later that morning, Manfredi discussed Lamar's behavior with Wirchen and Pesce. She testified that she told them "Something's got to be done about this kid because he's going to get into deeper trouble." (*Id.*)

On February 14, Frances complained to Manfredi that Lamar had bothered her during school by putting his hands in her face. Frances said that Lamar did not strike her. Manfredi testified that she sent two notes—one to Wirchen and one to Pesce—to complain about this incident. (Manfredi Dep. at 54.) The next day, Manfredi spoke with Wirchen and told her, "You know, this can't go on like this. I could tell her grades are dropping." (*Id.*)

Manfredi testified that on March 5, Frances again complained to her that Lamar was "bothering her, teasing her, tormenting her" and that he was "poking her this time with his finger." (*Id.* at 56.) Frances said that this happened in the classroom and that when she had told Ms. Wirchen about it, Ms. Wirchen told her to get back to her work. Ms. Wirchen's response made Frances cry. (*Id.* at 57.) Manfredi testified that she raised the crying incident with Wirchen the next morning, but that Wirchen's response was that Frances was falling behind in her work. (*Id.* at 59.)

At some point after March 5, but prior to March 14, Manfredi advised Frances that the next time Lamar bothered her she should "make like you're a car alarm and just scream." (*Id.* at 60.) On March 14, Frances and her classmates were about to have cupcakes in celebration of Frances' best friend's birthday when Lamar "bothered" Frances and poked her in the face. Frances began screaming. After she screamed, Wirchen got up from her desk, took away Frances' book and pencil and sent her out of the classroom—either to another room or to the hallway. There were no marks on Frances' face from the alleged poking. Manfredi complained to Wirchen about this incident the next day.

Sometime during the second week of April, Frances was asked to leave the classroom again. (*Id.* at 93.) Frances told her mother that she had gotten mad at Lamar after he threw her best friend in a garbage can. Frances said she yelled at Lamar and Ms. Wirchen then asked her to leave the classroom and go to Ms. Rinaldi's class (Rinaldi was another teacher at Pennington Grimes), where she remained for the rest of the school day.

On May 21, during the class "lineup" at the end of the day, Lamar bent down to tie his shoe, and when he did so grabbed Frances' lower leg. Frances testified that she did not tell Wirchen or Pesce about it. (O'Neill Dep. at 63.) At home that evening, Manfredi observed "little red marks" on Frances' leg that lasted until the next morning. (*Id.* at 102.) The next morning, Manfredi brought Frances with her to Pesce's office, where she asked him to look at Frances' leg. Manfredi testified that Pesce examined Lamar's file and told her that he would be doing something about the incidents.

Drawing all inferences in favor of Frances and her mother, these nine incidents amount to nothing more than the sort of mean-spirited teasing that troublesome little boys inflict from time to time on little girls who seem vulnerable.

One final incident occurred on May 23. Frances testified that Lamar touched her while the class was standing in the hallway or stairway on the way to gym class:

Q. Tell us what he did.

.    .    .    .    .

A. He touched my private.

Q. Where did he touch your private?

A. My vagina. (O'Neill Dep. at 64.)

Frances further testified that Lamar had touched her vagina—over her clothing—for a "quick second" while he was pretending to lean down to tie his shoes. She testified that no one in the class saw him do it. According to Frances, Lamar was "giggling to himself" after he did it. (*Id.* at 65.) Frances did not tell Wirchen, Pesce or any other teachers or administrators at Pennington Grimes about what happened.

Manfredi testified that Frances "didn't look right" and was not acting in her usual way when she got home from school that day. (Manfredi Dep. at 110) Manfredi testified that when she asked Frances what was wrong, Frances told her that Lamar had touched her "private spot." Manfredi did not ask Frances where, exactly, Lamar had touched her, but that she assumed that Frances meant she had been touched on her "breasts." (*Id.*) She immediately called Pesce to complain about the incident and to tell him that she would come in to see him. Manfredi did not mention to Pesce anything about Frances being touched on her vagina; rather, she told Pesce that Frances had been touched on her "breast." (Def. 56.1 Statement). Manfredi testified that Frances cried that night and slept in Manfredi's bed with her. Manfredi testified that Frances wet the bed that night. (*Id.* at 123.)

The next day, Manfredi and her brother took Frances to Pennington Grimes. Manfredi's brother called Lamar out of his class to confront him and tell him what he did was wrong. At some point, Wirchen asked Manfredi and her brother to leave and Pesce became involved in the situation. The police were called to the school. After a police officer arrived, Manfredi took Frances to the police station to file a complaint about what Lamar had done. Frances testified that she did not use the word "vagina" until she was at the police station. (O'Neill Dep. at 69.) No criminal charges were filed by the authorities. After Plaintiffs filed the complaint at the police station, Manfredi and Frances went to the Board of Education, where they also filed a complaint. (Manfredi Dep. at 138.)

After the May 23 incident, Frances was transferred to another class. There were no further incidents with Lamar.

Neither Manfredi nor Frances has alleged that Lamar ever made any comments that were sexual or suggestive in nature. Except for the May 23 incident, Frances alleged no behavior on Lamar's part that was even remotely sexual in nature.

Frances finished the school year successfully. At the conclusion of the 1995–1996 school year, Frances passed all of her courses, receiving grades of G(+/-) (i.e., meets or exceeds expectations) in most of her subjects. Her total number of absences decreased steadily from the first grade, where she was absent 20 times, to 15 absences in second grade, 13 days each in third and fourth grade, and 10½ days absent in fifth grade. Except for Frances' absence to accommodate her trip to the precinct on May 24, there is no evidence in the record linking any of Frances' fifteen absences during her year to incidents of teasing involving Lamar.[3] Frances has been promoted from grade to grade at the Pennington Grimes School, and has consistently received good grades since the alleged incidents of harassment. Manfredi testified that she thought Frances is doing "all right ... because there's more B's than C's." (Manfredi Dep. at 173.)

This lawsuit was filed on September 23, 1997, almost a year and a half after the last incident occurred. Frances did not consult with any doctor or mental health professional regarding the alleged incidents until after her mother had retained counsel, which was sometime in 1997.

3. It appears Frances would have attended school on May 24, but disruptive behavior at Pennington Grimes by her mother and uncle escalated the matter into a police incident, whereupon the adults took the child out of school for the day.

When she did meet with a professional, Manfredi could not recall if it was a "psychiatrist or psychologist," but did recall that the three meetings took place *in her lawyer's office after this lawsuit was filed.* (Def's Aff. Exh. D at 148–51.) Beginning in September 1998, more than two years after she completed second grade, and a year after this lawsuit commenced, Frances began to see a counselor at the BSB Wholistic Psychological Center in Mt. Vernon. (*Id.* at 155–56.)

### Grounds for the Motion

Defendants move for summary judgment on the basis that Plaintiff has failed to raise any genuine issue of material fact from which Defendants can be found liable under Title IX. Specifically, Defendants argue that (1) no actionable sexual harassment took place, and (2) Plaintiff was not deprived of access to educational opportunities. Individual Defendants argue that, even if harassment had occurred, no cause of action can be maintained against them under Title IX. In the alternative, they argue that, even if a cause of action could be maintained against them, they are entitled to qualified immunity.

### Standard for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id,* at 255, 106 S.Ct. 2505. However, to defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### Discussion

In *Davis v. Monroe County Bd. of Education,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Supreme Court held that, in some but not all circumstances, a school district may be held liable for student-to-student sexual harassment under the implied right of private action under Title IX. Plaintiff argues here that the ten separate incidents about which she and her daughter testified constituted a pattern of sexual harassment, and that the school's failure to stop Lamar demonstrates deliberate indifference by the school administrators and school board. Invoking *Davis,* Plaintiff argues that Frances was deprived of access to educational opportunities to which she is constitutionally entitled.

There is no dispute here that the Mount Vernon School Board receives federal funding. The issue before the Court is whether the evidence in the record supports a claim for denial of educational rights under Title IX.

■ A school district may be liable for damages under Title IX for student-on-student sexual harassment where:

(1) the school district is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority; and

(2) plaintiff can show that the alleged conduct was so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits of the school. *Davis,* 119 S.Ct. at 1675.

The Supreme Court noted in *Davis* that liability for "deliberate indifference" could only be found "where the funding recipient has some control over the alleged harassment" and that "[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial remedy." *Davis,* 119 S.Ct. at 1672. Thus, the liability of the funding recipient is limited

to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* (emphasis added). The Court found that misconduct that occurs during school hours and on school grounds falls into the category of conduct over which the school exercises substantial control. *Id.*

*Davis* involved a fifth-grade female student who was subjected to the unwanted sexual advances of a fellow fifth-grade male student. The complaint in *Davis* alleged that, over a period of five months, the male student fondled the female student's breasts, spoke in vulgar language and engaged in sexually suggestive behavior. The male student was alleged to have made comments such as "I want to get into bed with you" and "I want to feel your boobs." *Davis* 119 S.Ct. at 1666. He was also alleged to have placed a doorstop in his pants and acted in a suggestive manner toward the female student. The student's mother complained to the school principal, who promised to "threaten" the male student "a bit harder." *Id.* The female student was not permitted to change her seat in the class for three months. At the end of the string of harassing incidents, the male student was charged with, and pled guilty to, sexual battery, a crime. *Id.* As a result of the harassment, the plaintiff alleged that her grades had dropped and she had written a suicide note. The complaint also alleged that several other girls had fallen prey to the harassing student's conduct. *Id.*

The District Court in *Davis* held that, absent an allegation "that the Board or an employee of the Board had any role in the harassment," the plaintiff had failed to state a cause of action against the school board and dismissed the case prior to discovery. *See D. v. Monroe Cty. Bd. of Educ.,* 862 F.Supp. 363, 367 (M.D.Ga.1994). The court dismissed the Title IX claims against the individual defendants on the ground that only federal funding recipients are liable for Title IX violations. *See id.* Plaintiff appealed and the Eleventh Circuit reversed, holding that a school board could be liable for student-on-student harassment under Title IX. *See Davis v. Monroe Cty. Bd. of Educ.,* 74 F.3d 1186, 1193 (11th Cir.1996). Upon rehearing *en banc,* however, the Eleventh Circuit affirmed the District Court's decision to dismiss the Title IX claim. *Davis v. Monroe Cty. Bd. of Educ.,* 120 F.3d 1390 (11th Cir.1997).

The Supreme Court reversed. Justice O'Connor writing for the majority, ruled that school boards, as recipients of Title IX funding, could be held liable for student-on-student sexual harassment as long as it had the effect of denying educational opportunities. The allegation that the Monroe County School District had been on notice of the male student's behavior and had done nothing to stop it sufficed to state a claim that the board denied the plaintiff's educational opportunities.

*Davis* is a classic example of the old law school maxim that "bad facts make bad law." What happened to the Plaintiff in *Davis* was horrible—indeed, she was the victim of a crime. However, despite the best efforts of the Supreme Court to restrict its reach, *Davis* will inevitably be applied to justify lawsuits over far less heinous behavior—like this one.

As in *Davis*, the conduct here took place in the classroom and hallways of the school. The conduct of the male student here, like the conduct of the alleged harasser in *Davis*, thus falls within the category of conduct over which the school exercises substantial control. Further, the Plaintiff has testified that Pesce and Wirchen did not take action in response to her initial complaints about Lamar's behavior. She has thus raised a genuine issue of whether the school authorities acted with deliberate indifference.

However, I hold that Plaintiff's claim fails because she has failed to raise any genuine issue of material fact from which a jury could conclude that Frances was subjected to "peer on peer *sexual* harassment" or to conduct that was "so severe, pervasive, and objectively offensive that it can be said to deprive [her] of access to

the educational opportunities or benefits provided by the school." *Davis,* 119 S.Ct.at 1675.

Justice O'Connor, writing for *Davis* majority, hypothesized that harassment accompanied by physical threats that prevent a student from attending school or accessing particular school resources would be a clear example of conduct which, if known by the school administration and deliberately ignored, might lead to a deprivation of access to educational opportunities or benefits. *See Davis,* 119 S.Ct. at 1675. Whether other gender-oriented conduct "rises to the level of actionable 'harassment,'" however, "depends on a constellation of surrounding circumstances, expectations, and relationships.' including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Id.* (citations omitted). Justice O'Connor continued:

> Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing and gender-specific conduct that is upsetting to students subjected to it. *Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender.* Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims equal access to education that Title IX is designed to protect. *Id.* at 1675.

■ I must apply this standard to the facts of this case, viewing them most favorably to the Plaintiff. The conduct complained of here took place when Frances was seven years old. The boy who engaged in the alleged harassing behavior was also seven years old. Frances testified to five incidents of generalized "teasing" or "bothering." She has also testified to one instance where she was pushed by Lamar, one occasion when he punched her and one occasion when he grabbed her leg. She testified to one instance of Lamar's pushing her friend. She has not alleged that she was ever subjected to any sexual comments. I thus conclude that, as a matter of law, the nine incidents that took place between November 1995 and May 23, 1996, did not constitute "sexual" harassment that denied France "access to educational opportunities." In fact, these nine incidents did not constitute "sexual" harassment at all, as the law understands that term. Teasing, kicking, shoving and pokes in the face are annoying and hurtful to any child who is victimized by them. Such behavior may even may even leave a child quite traumatized and upset. But in *Davis,* Justice O'Connor went to great pains to make clear that such conduct— even if perpetrated by a child of one gender against a child of another gender—is not actionable as "sexual" harassment.

■ Only the May 23 incident could remotely be described as "sexual." Frances testified that Lamar touched her vagina through her clothing for a "quick second." More colloquially, he stuck his hand between her legs.

Assuming this testimony to be true, Lamar's action could be construed as an offensive touching.[4] In the employment law context, the Second Circuit has found that a single instance of offensive touching may constitute adult sexual harassment. *See*

4. Under no interpretation of Frances' testimony, however, could it said, as Plaintiff asserts in her brief, that Frances was "sexually accosted." (Pl. Br. at 8.) A little boy touched a little girl between her legs for a "quick second." This Court doubts that Lamar's action was motivated by "sexual gratification" to either party—a requirement for a sex offense under the New York Penal Law. *See,* N.Y. Penal Law § 130 (McKinney's 1999)(describing the elements of sexual offenses).

*Newsday v. Long Island Typographical Union No. 915, CWA, AFL–CIO,* 915 F.2d 840, 844 (2d Cir.1990)(citing EEOC guidelines that state "unwelcome, intentional touching of a charging party's intimate body areas is sufficiently offensive to alter the conditions of her working environment ... a single unwelcome physical advance can seriously poison the victim's working environment"). The *Davis* Court cautioned however, that while a single instance of one-on-one peer sexual harassment might, in some circumstances, have the effect of denying the victim equal access to education, it was "unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Davis* at 1676. Thus, even if the school had deliberately ignored Lamar's conduct (which it did not), it would be a reach to hold the school liable under Title IX.

In this case, however, I need not decide that question because Frances was not denied equal access to education. Frances missed only one day of school, May 24, when she went to the police station to file a complaint—and then only because she was kept out of school by her mother and her uncle. As soon as Pesce and Wirchen learned of Frances' one and only allegation about possible sexual touching, they moved her into another class, where she thrived. At the end of the school year, Frances was promoted to the third grade. Her mother expressed satisfaction with Frances' grades. The child did not require medical treatment—at least not until her mother decided to file a lawsuit. There is not a scintilla of evidence from which a rational trier of fact could conclude that Frances was deprived of access to even one educational opportunity by any action that might conceivably qualify as sexual harassment.

Finally, even if that one alleged incident of inappropriate touching perpetrated by one seven-year old against another could be construed as rising to the level of sexual harassment, under the *Davis* test, the school district cannot be liable. The evidence in the record indicates that, as soon as Manfredi complained of the touching, steps were taken to separate Frances from the boy. Frances was removed from Ms. Wirchen's class and placed in Ms. Rinaldi's classroom, where she remained for the rest of the school year. Plaintiff has simply failed to raise an issue as to whether the school district or its employees acted with deliberate indifference once they had actual knowledge of something other than the teasing of the sort teachers see every day.

For the above reasons, Plaintiff has failed to make out a claim under Title IX, and I dismiss all claims against Defendant Mount Vernon Board of Education.

*Individual Defendants' Liability*

■ Individual Defendants argue that no cause of action lies against them in their individual capacities under Title IX. Even prior to *Davis v. Monroe,* it was the law of this circuit that Title IX provided an implied a private right of action by a student against the recipient of federal educational funding for a denial of access to public education. *See Bruneau v. South Kortright Central School District,* 163 F.3d 749, 757 (2d. Cir.1998). The Second Circuit has never addressed whether an individual might be held liable under a Title IX private cause of action. However, the lower court in *Davis,* and the weight of authority in Court of Appeals' decisions prior to *Davis,* interpreted "recipient" to mean *the institution* that receives federal educational funding, *not individual employees* of those institutions. *See Soper v. Hoben,* 195 F.3d 845, 854 (6th Cir.1999); *Kinman v. Omaha Pub. School Dist.,* 171 F.3d 607, 611 (8th Cir.1999): *Smith v. Metropolitan School Dist.,* 128 F.3d 1014, 1019–1020 (7th Cir.1997), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998); *D. v. Monroe Cty. Bd. of Educ.,* 862 F.Supp. 363, 367 (M.D.Ga.1994).

The Supreme Court's decision in *Davis* extended liability for peer-on-peer sexual harassment under Title IX to the institutional aid recipient, not to the employees of the recipient, and thus implicitly adopted the interpretation already being applied by the lower courts. *See Davis,* 119 S.Ct. at 1669–1670 (citing *National Collegiate Athletic Assn. v. Smith,* 525 U.S. 459, 119 S.Ct. 924, 929 n. 5, 142 L.Ed.2d 929 (1999))(rejecting suggestion "that the private right of action available under ... § 1681(a) is potentially broader than the Government's enforcement authority"); *See also Niles v. Nelson,* 72 F.Supp.2d 13, 17 (N.D.N.Y.1999)(noting that all circuits and all but one of the district courts to address the issue have held that individuals may not be liable under Title IX) (citations omitted). I therefore conclude that Pesce and Wirchen cannot be held liable for their actions under Title IX and I dismiss the claims against them on that basis.

Because no cause of action can be maintained against them under Title IX, and because there was no sexual harassment, I need not address the issue of whether the Individual Defendants might be entitled to qualified immunity.

Having dismissed all of Plaintiff's federal claims, I decline to exercise jurisdiction over Plaintiff's pendent state claim.

*Conclusion*

In deciding this case, I was reminded of the prescient warning that came out of the *Davis* case:

The Court clears the way for the federal government to claim center stage in America's classrooms. Today's decision mandates to teachers instructing and supervising their students the dubious assistance of federal court plaintiffs and their lawyers and makes the federal courts the final arbiters of school policy and of almost every disagreement between students. Enforcement of the federal right recognized by the majority means that federal influence will permeate everything from curriculum decisions to day-to-day classroom logistics and interactions. After today, Johnny will find that the routine problems of adolescence are to be resolved by invoking a federal right to demand assignment to a desk two rows away. *Davis,* 119 S.Ct. at 1691–92 (1999).

These words, however, come not from the majority opinion, but from Justice Kennedy's dissent. His vision was rejected by the majority as unlikely to occur. *See Davis,* 119 S.Ct. at 1675–76. As it turns out, he was Cassandra.

I am, of course, bound by the *Davis* Court's majority view that Title IX creates a private right of action against a school board for student peer-to-peer sexual harassment. Fortunately, Justice O'Connor tried to set a high bar for liability, and I am thus able do the right thing and dispose of this case before trial. But the fact that *Davis* was on the books also ensured that this case, involving an unruly little boy and a sensitive little girl—and nothing "sexual" as adults understand that term—would (and did) survive a pre-discovery motion to dismiss. A young girl was subjected to hours of questioning about painful childhood taunts and teasing. And countless hours of school resources (not to mention taxpayer funds) were expended because the floodgates of federal litigation in the schoolroom and the schoolyard have been opened. Surely, such a use of educational and judicial resources diminishes the real gains in educational opportunities for women and girls that have been brought about as a result of Title IX.

This constitutes the decision and order of this Court.