KANNE, Circuit Judge.
Five-year-old Gabrielle M. began kindergarten at Beacon Hill School in the Park ForestAhicago Heights School District on August 31, 1998. Gabrielle was one of roughly 20 students in Mary Mul-ry’s class, which was also supervised by teacher’s aide Elizabeth Roselli. Mulry’s classroom was one of seven kindergarten classes at the school that year.
Gabrielle stated in her deposition that Jason L., another five year old in her class, began “bothering” her on the first day of class (Gabrielle did not explain what she meant by “bothering”). Gabrielle did not tell school officials or her parents about Jason’s behavior. Athough Gabrielle had been eager to start school, her parents noticed in September that she became reluctant to go to school, crying at the door when it was time to go. She also began wetting her bed and having nightmares around this time. At the time, Gabrielle’s parents did not know what caused the changes in her behavior.
In October, Mulry began to notice Jason’s problematic behavior. Early in the month, Mulry saw Jason jump on Gabrielle’s back at recess. She separated the *819 two, and Jason was suspended from recess for the rest of the week. On October 21, Roselli saw Jason lean against Gabrielle with his hands on his crotch. Roselli removed Jason from the room and took him to the principal’s office. The principal, George McJimpsey, was not in his office, so Roselli put Jason in time out, away from other students, and described Jason’s behavior to Mulry. Later that day, a student told Mulry that Jason had unzipped his pants and was showing other students his underwear while her back was turned. Roselli again took Jason to McJimpsey’s office and informed him of both incidents that occurred that day. McJimpsey told Jason that his behavior was inappropriate and warned him not to repeat it. Roselli and Jason then returned to class and Ro-selli seated Jason separately from the other students. After school, Mulry called Jason’s mother and told her to call McJimpsey about the incidents.
Two days later, Jason again unzipped his pants in class. Mulry separated Jason from the rest of the class, but Jason left his seat and again unzipped his pants in front of other boys. Mulry took Jason to McJimpsey’s office, and McJimpsey phoned Jason’s mother. Jason received a half hour of after-school detention because of the incident.
On October 28, Mulry noticed that Jason and a classmate, Ashley, had their hands down each others’ pants during storytime. Mulry immediately told the two to come over to her and Ashley reported that another girl, Tatiana, was also putting her hands down other students’ pants. Mulry asked a teacher’s aide to take Jason, Ashley, and Tatiana to the school psychologist, Larry Anthony. Anthony sent for Gabrielle and another girl when the children in his office told him that the two girls were also involved. During Anthony’s meeting with the five children, the children informed him that during the previous week they had kissed and jumped on top of one another at recess. Anthony told them that their behavior was inappropriate and that they should tell their parents or teachers when such things occurred. After school, Mulry went to Anthony’s office, and Anthony described the meeting to her and called the children’s parents. In his notes regarding the incident, Anthony reported that it was “becoming apparent that these Kindergarteners [sic] were not fully aware of the seriousness of their actions.”
Theresa, Gabrielle’s mother, went to the school the next day to talk with McJimp-sey. Theresa then took Gabrielle to lunch to speak with her privately, at which time Gabrielle told her she didn’t want to go back to school because Jason had been doing “nasty stuff’ to her since her first day.
After returning Gabrielle to school, Theresa told Mulry about her conversation with Gabrielle and that Gabrielle had recently developed problems with nightmares and bedwetting. That day Theresa also asked McJimpsey to move Gabrielle to a different classroom. McJimpsey agreed and also suspended Jason from school for two days. Theresa called McJimpsey the next day to ask that Jason switch classrooms instead of Gabrielle. According to Theresa, McJimpsey initially resisted, but transferred Jason after Theresa threatened to remove Gabrielle from the school. McJimpsey also agreed to assign Jason to different lunch and recess times.
Lunchroom supervisors separated Jason from the other students in the lunchroom for two weeks. After that, Jason returned from isolation and rejoined the other students for lunch. When he returned, Jason’s and Gabrielle’s classes were still assigned to the same lunch and recess period. Nevertheless, they did not eat together: Jason’s class would eat lunch at one table, while Gabrielle’s would *820 eat at another. And at recess, a playground supervisor was to ensure that Jason’s class did not interact with Gabrielle’s class. For example, one group would be allowed to play on the swing and exercise equipment while the other group played on the blacktop. Despite this effort, Gabrielle told her mother that once Jason returned to the same lunch and recess period, he talked to her and said that he “want[ed] to play with me funny ways” at recess. Gabrielle stated in her deposition that she also told her teacher and principal that Jason continued to bother her. Theresa stated that she also complained to McJimpsey. According to McJimpsey, he promptly rescheduled lunch for Mulry’s students so that Jason and Gabrielle would not go to lunch or recess at the same time. But according to a letter from Gabrielle’s attorney to the school district, Jason continued to bother Gabrielle at lunch and recess until March 1 despite these actions.[1]
In early November, Gabrielle’s parents took her to her pediatrician because she was experiencing bedwetting, insomnia, nightmares, and loss of appetite. The doctor referred her to a counselor, who diagnosed Gabrielle with acute stress disorder and separation anxiety due to Jason’s behavior toward her. Gabrielle continued therapy until May 1999, when her counsel- or determined that she was asymptomatic.
Sometime in the spring of 1999, Gabrielle’s parents asked the school district to transfer her to another school. The school district agreed, and Gabrielle began first grade at Algonquin School. It is not clear when her parents made the request, though McJimpsey stated in his deposition that the Superintendent of Schools granted the request “immediately.”
Gabrielle sued McJimpsey for intentional infliction of emotional distress and her school district under Title IX of the Education Amendments of 1972 alleging that Jason’s conduct amounted to sexual harassment. Generally, Gabrielle claims that Jason “bother[ed]” her and did “nasty stuff’ to her since the beginning of the *821 school year. Moreover, Gabrielle’s father, Stanley, testified that Gabrielle had told him that Jason had touched her inappropriately:
Q: Did Gabrielle ever tell you that she had been touched by [Jason]?
A: Yes.
Q: Sexually?
A: Yeah, he fondled pretty much half the girls in the classroom.
Q: Where was it that he was fondling them? Did she tell you?
A: Private parts, chest.
(R. 24, Stanley Dep. at 24:5-13.) Specifically, Gabrielle identifies the events occurring during the week of October 21 (i.e., Jason jumping on her back; Jason pulling down his pants in front of the class; his leaning against Gabrielle in the computer room; and the five students climbing upon and kissing one another) and October 28 (i.e., the story-time incident between Jason, Gabrielle, and other girls in the class) as evidence of Jason’s harassing conduct. Gabrielle also claims that after the school district had learned of Jason’s conduct and had taken action to separate him from Gabrielle on her mother’s request, the two continued to have contact for as long as four months during lunch and recess, where Jason continued “trying to get [her] attention when [she] was trying to eat at lunch time, and kept on wanting to play with [her] funny ways at recess time.”
The school district moved for summary judgment arguing that the complained-of conduct did not rise to an actionable level for purposes of Title IX and that, even if it did, the school’s response to Jason’s conduct was not clearly unreasonable. In awarding summary judgment, the district court found that the school district had actual notice of Jason’s behavior as of October 21, when Roselli saw Jason act inappropriately toward Gabrielle. The court then evaluated the district’s response to Jason’s behavior and found the response to be adequate. The court found that summary judgment therefore was appropriate on Gabrielle’s federal claim and accordingly declined to exercise supplemental jurisdiction over the state-law tort claim against McJimpsey.
DISCUSSION
On appeal, Gabrielle argues that the district court improperly granted summary judgment on her Title IX sexual harassment claim. The Supreme Court has held that a school district receiving federal funding may be hable for damages under Title IX when one student sexually harasses another. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The court established in Davis that liability may exist “where [funding recipients] are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.” Id. at 650.
Before we evaluate whether the school district’s actions (or refusals to act) amounted to deliberate indifference, Davis requires us to examine the student-on-student harassing conduct itself to determine whether it is “so severe, pervasive, and objectively offensive” that it has a “concrete, negative effect” on the victim’s access to education. Id. There is a threshold question, altogether reasonable and rational, of whether a five or six year old kindergartner can ever engage in conduct constituting “sexual harassment” or “gender discrimination” under Title IX. Common sense, at least, would reject any such extension of Title IX. Nevertheless, we need not answer whether six year old Jason should carry the label of “sexual har *822 asser,” as we will assume arguendo that Jason’s conduct was “sexual harassment.”
Even assuming that Jason’s conduct amounts to “sexual harassment,” thus bringing it within the ambit of Title IX, an action under this statute “will lie only for [sexual] harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim’s access to educational opportunity or benefit.” Id. at 633, 119 S.Ct. 1661. Whether behavior is so severe, pervasive, and offensive as to create a cause of action under Title IX is a fact-specific inquiry. The Court in Davis recognized the obvious fact that young children are still in the process of learning appropriate behavior and “may regularly interact in a manner that would be unacceptable among adults.” Id. at 651, 119 S.Ct. 1661. Acknowledging that almost by definition young children engage in this “dizzying array of immature ... behavior,” the Davis Court distinguished “simple acts of teasing and name calling among children” from behavior that could constitute actionable harassment. Id. at 651-52, 119 S.Ct. 1661 (quotation omitted).
Most of the complained-of conduct alleged by Gabrielle is so vague and unspecific that it cannot provide a basis to determine whether that conduct was severe, pervasive, and objectively offensive harassment. It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations. Fed.R.Civ.P. 56(e); Hadley v. County of DuPage, 715 F.2d 1238, 1243 (7th Cir.1983) (“Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.”). Thus, Gabrielle cannot avoid summary judgment by asserting general allegations that Jason “bothered” her by doing “nasty stuff.” In the context of peer harassment between five and six year olds, such allegations are as indicative of nonactionable teasing and name calling as they are of potentially actionable harassment, and thus they provide no support for Gabrielle’s claim. Nor can she avoid summary judgment by her equally unspecific testimony that Jason wanted to play with her “funny ways” at recess. Similar allegations of unarticulat-ed conduct have been shown to be insufficient to defeat summary judgment in hostile-work-environment cases. See, e.g., Bloomer v. Slater, 2002 WL 1949728, at *9 (N.D.Ill. Aug.23, 2002) (refusing to allow plaintiff to rely on vague, general allegations of inappropriate comments to support hostile environment claim where plaintiff presented no evidence of the details of the offending conduct). Moreover, her father’s testimony that Gabrielle had told him that Jason touched her inappropriately is also insufficient evidence to support her claim. First, it is hearsay and cannot be admitted to prove the truth of the matter asserted — that Jason touched Gabrielle. Second, even if it was admissible it is still too vague and general: although it is more specific than Gabrielle’s other allegations because it identifies the areas Jason allegedly touched— “[p]rivate parts, chest” — it still does not present details of when, where, or how often this alleged conduct occurred and whether it was reported. Those details are necessary to evaluate the severity and pervasiveness of the conduct, see, e.g., Manfredi v. Mount Vernon Bd. of Educ., 94 F.Supp.2d 447, 454-55 (S.D.N.Y.2000) (finding a single incident of offensive touching between first graders insufficient to rise to the level of severe, pervasive, and objectively offensive conduct given the Davis Court’s cautionary statement that it was “unlikely Congress would have thought such behavior sufficient ... in *823 light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.” (citing Davis, 526 U.S. at 652-53, 119 S.Ct. 1661)), not to mention other requisite elements of a Title IX deliberate-indifference claim, such as actual knowledge.
We turn, therefore, to the specific instances of inappropriate conduct alleged by Gabrielle and reported to school officials, which include Jason’s jumping on Gabrielle’s and other students’ backs and kissing each other, Jason pulling his pants down in front of other students, the computer-room incident, and the story-time incident. Leaving aside for a moment the fact that not all of these incidents involve conduct between Jason and Gabrielle (or Jason and other girls for that matter), the only evidence in the record shows that Jason and the other children involved were unaware of the sexual nature of their behavior. According to the school psychologist, Anthony, the children were “unaware of the seriousness” of their actions. The children, then, were not engaging in knowingly sexual acts, a fact that (at a minimum) detracts from the severity and offensiveness of their actions.
Moreover, an action under Title IX lies only where the behavior at issue denies a victim equal access to education. Id. at 652, 119 S.Ct. 1661. The harassment must have a “concrete, negative effect” on the victim’s education. 'Id. at 654, 119 S.Ct. 1661. Examples of a negative impact on access to education may include dropping grades, id. at 634, 119 S.Ct. 1661, becoming homebound or hospitalized due to harassment, see Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1248-49 (10th Cir.1999), or physical violence, see Vance v. Spencer County Public Sch. Dist., 231 F.3d 253, 259 (6th Cir.2000). Here, however, there is no evidence that Gabrielle was denied access to an education. Although she was diagnosed with some psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase. Nothing in the record shows that she was denied any educational opportunities by Jason’s actions.
But even if we were to decide Jason’s actions were severe, pervasive, and objectively offensive sexual harassment that had a concrete, negative effect on' Gabrielle’s access to education, we are not convinced that the school district’s response to known harassment was clearly unreasonable. Examining the school district’s response to the complained-of conduct, we agree with the district court’s conclusion that the school district’s actions were not so clearly unreasonable as to amount to deliberate indifference.
As an initial matter, the school district can only be liable for harassment about which it has actual knowledge. Gabrielle argues that the school district had actual notice of Jason’s behavior as of August 31 (the first day of school), because Gabrielle testified that Jason began bothering her on the first day and because the teachers constantly supervise kindergartners and thus must have noticed this behavior. While it is certainly true that such young students are under near-constant supervision, Davis established that actual — not constructive — notice is the appropriate standard in peer-harassment cases. Davis, 526 U.S. at 646-47, 119 S.Ct. 1661. Courts, therefore, have focused on reports or observations in the record of inappropriate behavior to determine when school officials had actual notice. See Vance, 231 F.3d at 259 (notice requirement satisfied by student and parent’s reports to teachers and principal); Soper v. Hoben, 195 F.3d 845, 855 (6th Cir.1999) (defendants had actual notice of rape and sexual as *824 sault only after incidents were reported to them); Murrell, 186 F.3d at 1247 (parent’s telephone call to principal about harassment was evidence of actual notice). Nothing in the record shows that Beacon Hill school officials observed or that anyone reported sexual behavior by Jason towards Gabrielle (or anyone else) before October 21. Thus, there is no evidence that the defendants had notice of any harassing conduct before this date.
Once school officials have actual notice of sexual harassment, Davis imposes a duty to act. But as long as the school’s response is not “clearly unreasonable,” it cannot have acted with the requisite deliberate indifference to incur Title IX liability. Davis, 526 U.S. at 648-49, 119 S.Ct. 1661. According to Davis, this is not a mere reasonableness standard, nor does it require funding recipients to remedy peer harassment. Id. Indeed, “[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable’ as a matter of law.” Id. at 649, 119 S.Ct. 1661.
This is such an appropriate case. The record reveals that the school district’s response to Jason’s inappropriate conduct was not clearly unreasonable. After each reported or observed instance involving Jason and other students, Jason was disciplined and steps were taken to prevent future inappropriate conduct. When Mulry saw Jason jump on Gabrielle’s back at recess, he was disciplined and suspended from recess for the rest of the week. When Jason leaned against Gabrielle with his hands on his zipper, he was placed in time out. When he pulled down his pants exposing his underwear to other students in the class, Jason was temporarily removed from the class, disciplined by McJimpsey, and his mother was called. When Jason exposed himself to three other boys two days later, he was again sent to McJimpsey’s office, his mother was called, and he received detention. And when Jason and Ashley were seen with their hands down each other’s pants and when the students revealed that Gabrielle and others were involved as well, all of the students were sent to the school’s psychologist to discuss the incident and their parents were called. After serving a two-day suspension, Jason was transferred to a different kindergarten class. Additionally, Jason was placed at an isolation table for two weeks during lunch and recess period before he was allowed to rejoin his new class.
Nevertheless, Gabrielle asserts that these actions were insufficient to protect her from further unwanted contact with Jason during lunch and recess. Notably, Gabrielle does not deny that McJimpsey took steps to minimize Jason’s contact with Gabrielle during a communal lunch and recess period: each of the students’ classes were assigned to different lunch tables and a recess supervisor was instructed to ensure that the two students did not interact at recess. Nor does she deny that McJimpsey eventually rescheduled the two classes to different lunch and recess periods. All that Gabrielle denies is the remedial effect of these steps, claiming that as late as March 1999, Jason continued to bother her. Presumably, McJimpsey’s initial action of recess supervision was ineffective since Theresa subsequently complained that the two students continued to come into contact. Even after the lunch- and-recess-period switch, Gabrielle explains that Jason and Gabrielle would still have had occasion to interact during approximately thirty days of inclement weather where both classes would have had lunch and recess indoors at the same time in the same room.
*825 But in arguing that in order not to act with deliberate indifference, the school district must have effectively ended all interaction between the two students to prevent conclusively any further harassment, Gabrielle misunderstands the law. Davis does not require funding recipients to remedy peer harassment. Id. at 648-49. Davis disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct. Id. All that Davis requires is that the school not act dearly unreasonably in response to known instances of harassment. Id. Here, in light of each of the immediate disciplinary and preventative steps the school district had already taken in response to Jason’s conduct, including most prominently the decisions to move him to another class entirely and eventually to grant Gabrielle’s request for a school transfer, it was not clearly unreasonable as a matter of law initially to assign an instructor to oversee a communal recess and lunch period instead of immediately rescheduling the lunch and recess period for a whole kindergarten class. Nor is it clearly unreasonable that in days of inclement weather Gabrielle and Jason may have had occasion to interact in the one lunchroom where all the school’s students had to take lunch. In both instances, the school may take into consideration administrative burdens or the disruption of other students’ or their teachers’ schedules in determining an appropriate response. As Davis noted, courts should refrain second-guessing the disciplinary decisions made by school administrators. Id. at 649, 119 S.Ct. 1661; cf. Ulichny v. Merton Community School District, 249 F.3d 686, 706 (7th Cir.2001) (opining that school administrators should be supported, rather than second-guessed, in their “heroic efforts” to teach our nation’s young people).
Therefore, under existing law, taking into account the ages of the children involved, their apparent lack of knowledge of the nature of their actions, and the lack of impact on Gabrielle’s ability to attend and perform at school, we find that the alleged harassment was not so severe, pervasive, and objectively offensive that it denied Gabrielle access to educational opportunities. Even if it was, the school district’s response was not so clearly unreasonable as to render it liable under Title IX. The judgment of the district court therefore is AFFIRMED.

. The record reveals that Gabrielle does not dispute that McJimpsey initially assigned an instructor to ensure that Jason's and Gabrielle’s classes did not interact at lunch or recess or that he eventually assigned her class and Jason's to different lunch and recess periods altogether. In response to the defendants' uncontested statement of facts in which they cite Mulry's and McJimpsey's testimony on these points, Gabrielle questions only the effectiveness of the supervision and later separation asserting that (1) "following this change,” there were approximately thirty days of inclement weather during which time the two classes would have lunch and recess in the same lunchroom at the same time and that (2) Gabrielle reported as late as March 1999 that she was still being bothered by Jason at lunch and recess. (R. 27 at ¶¶ 113, 115.)
The only part of the record that denies that the school took these actions is the March 1 letter from Gabrielle's counsel. The unsupported allegations of counsel cannot provide evidence sufficient to withstand summary judgment. See, e.g., Thorn v. IBM, Inc., 101 F.3d 70, 75 (8th Cir.1996). Thus, to the extent this letter differs from Gabrielle's admissions of fact in response to defendants’ uncontested statement of facts, it is immaterial. Moreover, the statement of counsel therein that "it has come to the attention of the parents that the boy is assigned to the same ‘black top’ period as Gabrielle” is itself inadmissible hearsay, which cannot be introduced to prove the truth of the matter asserted.
Finally, Gabrielle's own deposition testimony is consistent with the denials and admissions set forth in her response to the defendants' uncontested statement of facts: that sometime after Jason had been switched to another class, he continued to bother her at lunch and recess. Based on her admissions, that testimony can refer only to the period of time that both students were assigned to the same lunch and recess period under supervision, or those approximately thirty days of inclement weather where they would have been in the same lunchroom .for both periods.